UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THANH SON TRAN, et al.,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>MINH DUC PHAM, et al.,<br><br>　　　　　Defendants. | Case No. 5:25-cv-10326-BLF<br><br>**ORDER GRANTING APPLICATION FOR TEMPORARY RESTRAINING ORDER; ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED** |

Before the Court is Plaintiff Thanh Son Tran's noticed application for a temporary restraining order ("TRO"). ECF No. 13 ("App."). Defendant Minh Duc Pham opposes the motion. ECF No. 22 ("Opp."). The Court heard oral arguments on December 12, 2025, and ordered Mr. Tran to file a revised proposed TRO by December 17, 2025. ECF No. 24. Mr. Tran filed a proposed TRO, explaining that "[t]he language in this proposed order was negotiated by the parties' counsel for over 2 hours" and noting where the Parties disagreed in bold. ECF No. 26 ("Proposed TRO") at 2.

The Court GRANTS the application, as limited by the Proposed TRO.

**I.   BACKGROUND**

The Court accepts the following facts from Mr. Tran's declaration, ECF No. 13-2 ("Tran Decl."), as true for the purpose of adjudicating the TRO application. Mr. Tran and Mr. Pham co-founded One Amo, Inc. ("Amo") in October 2020, with Mr. Tran owning 42.5% of the shares and Mr. Pham owning 57.5% of the shares. *Id.* ¶¶ 1 10. Amo is a company in the business of developing artificial intelligence software to assist in the evaluation of mortgage loans. *Id.* ¶ 5. On March 3, 2021, Mr. Tran and Mr. Pham signed identical "Founder Invention and Non-Disclosure Agreements" ("NDAs") which prohibited them from using or disclosing confidential or

proprietary information without authorization. *Id.* ¶ 11.

Apart from Amo, Mr. Pham also wholly owns Wonder Rates, Inc. ("Wonder Rates"), a mortgage broker in Northern California. Tran Decl. ¶ 3; see also ECF No. 22-1 ("Pham Decl.") ¶ 1. Prior to founding Amo with Mr. Pham, Mr. Tran had also developed "BiFrost," which he describes as "a proprietary backend framework designed to allow startups to launch high-scale platforms quickly without having to rebuild core infrastructure from scratch." Tran Decl. ¶ 12. In his capacity at Amo as Chief Technology Officer, Mr. Tran recruited and trained an engineering team to develop Amo's platform using BiFrost. *Id.* ¶ 16. Using BiFrost as a backbone, Mr. Tran architected and led development of certain of Amo's core modules, including a loan processing module, rate engine module, and interest-rate optimization module. *Id.* ¶ 19. Mr. Tran avers that this "combination of BiFrost and these modules constitutes Amo's core proprietary technology and trade secrets" (the "Amo Information"). *Id.* 20.

After Amo's platform became functional, Wonder Rates became a customer of Amo and "began using Amo as its loan-processing system . . . at free or nominal cost." *Id.* ¶¶ 22–23. On July 23, 2021, "without notifying [Mr. Tran], Mr. Pham registered the fictitious business name 'AMO Mortgage/AMO Wonder Rates,' suggesting to the public that 'Amo' was merely a business name on Wonder Rates rather than a separate company." *Id.* ¶ 15. As time went on, the business relationship between Mr. Tran and Mr. Pham deteriorated, in part due to Mr. Pham's perception that Mr. Tran was failing to meet his capital obligations to fund Amo's operations. *Id.* ¶¶ 26–28; see also Pham Decl. ¶¶ 15–16. In May 2024, Mr. Pham told Mr. Tran that Amo was out of money and would be shut down. Tran Decl. ¶ 27. Unbeknownst to Mr. Tran, Mr. Pham continued to operate Amo and began working on "secretly . . . cloning Amo's technology into a separate Wonder Rates-owned system." *Id.* ¶ 28.

In early 2025, several individuals contacted Mr. Tran and advised him that Mr. Pham was cloning Amo's software and migrating features and data into a Wonder Rates platform. The Parties met on December 1, 2025, to address Mr. Tran's concerns: "During that meeting, [Mr. Pham] admitted that he had cloned Amo's platform; that the cloning necessarily included BiFrost; and that his intention was to have Wonder Rates replace Amo entirely. [Mr. Tran]

2

1  provided [Mr. Pham] with a courtesy copy of the complaint immediately after this discussion." *Id.*
2  ¶ 30.  Mr. Tran alleges that 85–90% of Wonder Rates' new platform is directly derived from the
3  BiFrost and Amo code.  *Id.* ¶ 31.

**II.   LEGAL STANDARD**

Courts use the same standard for issuing a temporary restraining order as that for issuing a preliminary injunction.  *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) ("[T]he legal standards applicable to TROs and preliminary injunctions are 'substantially identical.'" (quoting *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)).  An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Id.* at 20.

"[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (alteration in original) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

**III.   DISCUSSION**

Mr. Tran filed an application for a TRO (1) enjoining further cloning of Amo or BiFrost technology, (2) requiring Mr. Pham to return all misappropriated code and data to Mr. Tran, (3) requiring Wonder Rates to "pay fees and continue using the legitimate Amo platform (not the cloned system) . . . [and] refrain from deploying any cloned or derivate system," (4) enjoining Mr. Pham from evicting Mr. Tran, and (5) suspending Mr. Pham's corporate authority at Amo.  ECF No. 13-7.  In the Proposed Order, Mr. Tran clarified the scope of the relief requested.

**1.   Likelihood of Success on the Merits**

1  Mr. Tran's application is based primarily on his claim for trade secret misappropriation
2  under the Defend Trade Secrets Act ("DTSA"), but he also asserts violation of the Parties' NDAs.
3  *See* App. at 4–6. Based on the allegations in the complaint and Mr. Tran's accompanying
4  declaration, the Court concludes that Mr. Tran has at least demonstrated that there are "serious
5  questions" going to the merits of each claim. *Shell Offshore*, 709 F.3d at 1291.

6  "To prevail on a DTSA claim, an aggrieved plaintiff must plead and prove three elements:
7  (1) plaintiff owned a trade secret; (2) defendant acquired, disclosed, or used the protected secret
8  through improper means; and (3) defendant caused damage to plaintiff." *Juries.AI, Inc. v. Sheu*,
9  No. 5:25-cv-10188-BLF, 2025 WL 3290235, at *4 (N.D. Cal. Nov. 25, 2025) (internal quotation
10 marks and citation omitted). "A 'trade secret' is information that (1) derives independent
11 economic value, actual or potential, from not being generally known to, or readily ascertainable by
12 other people who can obtain economic value from its disclosure or use and (2) is subject to
13 reasonable efforts to maintain its secrecy." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834,
14 845–46 (N.D. Cal. 2019) (citing 18 U.S.C. § 1839(3)).

15 Mr. Tran has provided evidence that the Amo Information constitutes a cognizable trade
16 secret. The Amo Information includes source code and modules that perform discrete functions to
17 be offered as services by Amo, and such information is within the ambit of the DTSA's definition
18 of trade secrets. See 18 U.S.C. § 1893(3). The Tran Declaration further establishes that the Amo
19 Information derives economic value from not being generally known or readily available through
20 proper means because Amo has expended time, energy, and resources into its technology with the
21 expectation of offering a proprietary technological service to its mortgage broker customers. Tran
22 Decl. ¶¶ 16–20, 23. It further establishes that BiFrost is password-protected, has not been publicly
23 released, and is not open source. *Id.* ¶ 13. As to misappropriation, Mr. Pham apparently admitted
24 to copying the source code, *id.* ¶ 30, and Mr. Tran has also submitted a cloning analysis showing
25 substantial similarities between the two systems, *see id.* Ex. B. Such copying would constitute
26 misappropriation.

27 The NDA provides as follows:
28 > The Founder will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same

> for any purpose . . . without written approval by an officer of the Company, either during or after Founder's Service, unless and until such Proprietary Information has become public knowledge without fault by the Founder. While providing Service, the Founder will use the Founder's best efforts to prevent unauthorized publication or disclosure of any of the Company's Proprietary Information.

App. at 5. Mr. Pham seemingly does not dispute that his continued use through Wonder Rates of the Amo Information would breach the terms of the NDA, instead arguing that the breach-of-contract claim is preempted by the California Uniform Trade Secret Act and Federal Copyright Act. Opp. at 19–20.

Based on the foregoing, the Court concludes that there are at least serious questions going to the issue whether Mr. Tran will prevail on his DTSA and breach-of-contract claims. *See*, *e.g.*, *Richmond Techs., Inc. v. Aumtech Bus. Sols.*, No. 11-cv-02460-LHK, 2011 WL 2607158, at *19 (N.D. Cal. July 1, 2011)

### 2. Balance of Hardships

The Court concludes that the balance of equities tilts sharply in Mr. Tran's favor. Once the cloning process has been completed, Wonder Rates will be able to perform all of the functionality encompassed by the Amo Information, rendering Amo's commercial viability practically null.

In opposition, Mr. Pham argues that the injunction would destroy the commercial viability of both companies by forcing Wonder Rates to use inefficient and out-of-date code. Opp. at 22. At oral argument, however, the Parties clarified that no such harm would arise if Wonder Rates is permitted to continue using the Amo Information as a customer of Amo. The Court instructed the Parties to meet and confer to develop a proposed order that would preserve the commercial viability of both companies and relies on the representation in the Proposed TRO that counsel agreed on the terms. While the Court is of course mindful that Defendants would prefer for no TRO to issue at all, the Court presumes based on the Parties' representations at oral argument and in the Proposed TRO that the harms identified in the opposition brief are ameliorated by the specific terms proposed by the Parties.

### 3. Irreparable Harm

Mr. Tran has established that he is likely to suffer irreparable harm if a TRO is not granted. "[C]ourts in this district have 'presume[d] that Plaintiff will suffer irreparable harm if its

proprietary information is misappropriated.'" *Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-cv-01441-LHK, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) (second alteration in original) (quoting *W. Directories, Inc. v. Golden Guide Directories, Inc.*, No. 09-cv-1625, 2009 WL 1625945, at *6 (N.D. Cal. June 8, 2009)). As a technology startup, the economic value of the investments made in Amo are inextricably bound up with the maintenance of the Amo Information as confidential, and the NDA signed by Mr. Pham provides that "any breach or threatened breach . . . is likely to cause [Amo] substantial and irrevocable damage which is difficult to measure." ECF No. 1-2 ("NDA") § 7(a).

### 4. Public Interest

"[T]he public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer. Public interest is also served by enabling the protection of trade secrets." *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016). Courts in the Ninth Circuit regularly conclude that narrowly tailored injunctions advance the public interest by "serv[ing] the policy of protecting trade secrets while simultaneously allowing lawful competition." *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1093 (E.D. Cal. 2012); *accord Bambu Franchising, LLC v. Nguyen*, 537 F. Supp. 3d 1066, 1080 (N.D. Cal. 2021).

### 5. Security

The Ninth Circuit has "recognized that Rule 65(c) invests the district court 'with discretion as to the amount of security required, if any.'" *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)). The Court declines to order Mr. Tran to post bond, as the NDA signed by Mr. Pham provides that "in the event of any . . . breach or threatened breach . . . [Amo] shall have the right to obtain an injunction . . . without posting a bond." NDA § 7(a).

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Defendants and all persons acting in concert with them are RESTRAINED AND ENJOINED from copying, cloning, modifying, transferring, any portion of the BiFrost

6

platform, the One Amo platform, or any derivative thereof, and from deploying or operating any system derived from such code pending further order of the Court.

(2) Within 48 hours of service of this Order, Defendants SHALL:

    a. Cease all development on any cloned or derivative system of BiFrost or Amo other than for maintenance;

    b. Preserve all repositories, servers, databases, logs, backups, snapshots, and cloud instances containing BiFrost or One Amo code;

    c. Return and restore to the original code repository to which One Amo has access, all source code, repositories, branches, forks, backups, databases, schemas, and derivative works derived from BiFrost or One Amo that are within Defendants' possession, custody, or control.

(3) Pending the Court's ruling on the Order to Show Cause, Defendants SHALL NOT migrate, transition, test, deploy, or operate any new or replacement system derived from BiFrost or One Amo pending further order of the Court.

(4) Mr. Pham is temporarily suspended from exercising authority as a director or officer of One Amo, Inc., solely to the extent necessary to prevent dissolution, shutdown, asset transfer, sale, access, or disclosure of proprietary information during the pendency of this TRO.

(5) Defendants shall preserve all evidence, including but not limited to source code, repositories, logs, backups, databases, communications, emails, messages, cloud instances, devices, and credentials relating to BiFrost, One Amo, or any derivative systems.

(6) Mr. Pham SHALL appear before the Honorable Judge Beth Labson Freeman, United States District Judge, in Courtroom 1 of the United States District Court, Northern District of California, located at 280 South 1st Street San Jose, CA 95113, on March 19 2026, at 9:00 a.m. and show cause why a preliminary injunction with the same restrictions as the granted temporary restraining order should not issue during the pendency of this action.  Mr. Tran SHALL file his motion for a preliminary injunction

no later than February 13, 2026, with opposition briefs due February 27, 2026, and reply briefs due March 6, 2026.

(7) The parties may conduct limited, expedited discovery narrowly tailored to issues relevant to the preliminary injunction, including but not limited to scope of copying, system architecture, access or authorization to use One Amo trade secrets, repositories, loan-processing systems, and compliance with this Order.

    a. The parties may exchange written discovery by January 5, 2026.

    b. If there are any disputes that the parties cannot resolve, they shall bring the matter to the discovery magistrate by January 8, 2026, and request a decision by January 12, 2026. The parties shall respond to written discovery by January 19, 2026.

    c. The parties may each take the deposition of up to three persons by February 6, 2026.

(8) The TRO SHALL remain in effect until March 26, 2026. As explained at oral argument, the fourteen-day limit under Federal Rule of Civil Procedure 65 does not apply because this was not an ex parte TRO.

Dated: December 17, 2025

                                                    BETH LABSON FREEMAN
                                                    United States District Judge