**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THANH SON TRAN, | Case No.  5:25-cv-10326-BLF |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |
| MINH DUC PHAM, et al., | [Re:  ECF No. 47] |
| Defendants. | |

Plaintiff Thanh Son Tran brought this action against Defendant Minh Duc Pham, alleging that after Mr. Tran and Mr. Pham co-founded a company called One Amo Inc. ("One Amo"), Mr. Pham misappropriated proprietary technology from Mr. Tran and One Amo and diverted this value to his own company, Defendant Wonder Rates, Inc. ("Wonder Rates").  ECF No. 1.  On December 17, 2025, the Court granted Mr. Tran's application for a temporary restraining order ("TRO") and enjoined Mr. Pham and Wonder Rates from copying, deploying, or operating systems derived from Mr. Tran's "Bifrost" platform and One Amo's proprietary technology pending a hearing on Mr. Tran's motion for a preliminary injunction.  ECF No. 28 ("Order").

Mr. Tran now moves for a preliminary injunction during the pendency of this action.  ECF No. 47 ("Mot."); ECF No. 53 ("Reply").  Mr. Pham opposes the motion.  ECF No. 49 ("Opp.").  On March 20, 2026, the Court held oral argument on Mr. Tran's motion for a preliminary injunction, as well as on Mr. Pham's motion to dismiss the first amended complaint.  ECF No. 69.  That same day, the Court issued an order denying Mr. Pham's motion to dismiss and directing Mr. Tran to file an amended proposed preliminary injunction order.  ECF No. 71.

For the reasons stated on the record and set forth below, the motion for a preliminary injunction is GRANTED.

## I. BACKGROUND

### A. Factual Background

In October 2020, Mr. Tran and Mr. Pham co-founded One Amo, a Delaware corporation with its principal place of business in Santa Clara County, California. ECF No. 33 ("Compl.") ¶¶ 9–11; *see also* ECF No. 47-1 ("Tran Decl.") ¶ 11. One Amo is a technology company that operates a proprietary mortgage-technology platform (the "One Amo Platform"), which includes such components as "broker and borrower workflows; multi-tenant tenant-isolation logic specific to mortgage operations; role-based permissioning tailored to broker teams; pipeline and loan-status orchestration; pricing and rate-quote workflows; lender configuration and pricing rules; operational dashboards; audit trails; and proprietary integrations with communications channels and internal operational systems." Compl. ¶ 67. Mr. Tran is Chief Technology Officer and 42.5% shareholder of One Amo, and Mr. Pham is President and 57.5% shareholder of One Amo. *Id.* ¶¶ 9–11. Mr. Pham is also the sole founder and controlling officer of Wonder Rates, a California corporation with its principal place of business in Sunnyvale, California. *Id.* ¶¶ 11–12.

One Amo was conceived out of the Mr. Tran and Mr. Phan's idea to "create a chatbot capable of automating or replacing significant functions of a [mortgage] loan officer, including borrower intake, rate discussions, and workflow guidance." Compl. ¶¶ 28–29; *see also* Tran Decl. ¶ 12. Prior to founding One Amo with Mr. Pham, Mr. Tran designed and implemented a "complete backend software architecture known as BiFrost, . . . a reusable foundation to rapidly build secure, scalable, production-ready startup systems." *Id.* ¶ 40 (internal quotation marks omitted). During One Amo's pre-formation period, Mr. Tran informed Mr. Pham about BiFrost and its potential application in designing a multi-tenant software product. *See id.*

After initial discussions and experimentation, Mr. Tran and Mr. Pham "agreed to pursue the mortgage-automation business as co-founders and joint venturers," with Mr. Tran responsible for "contribut[ing] proprietary technology and engineering labor" and Mr. Pham responsible for "contribut[ing] funding, business operations, and industry relationships." Compl. ¶ 49. Mr. Tran and Mr. Pham agreed to co-found One Amo to develop and commercialize this technology and engaged Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") to incorporate One Amo.

2

United States District Court
Northern District of California

*Id.* ¶¶ 37–38. Based on Mr. Pham's representation that he would fund One Amo, pay Mr. Tran's compensation, and raise capital in 2021, Mr. Tran worked full-time to build the One Amo Platform. *Id.* ¶¶ 52, 58. Mr. Tran, "[u]sing BiFrost as a foundational architecture and applying extensive additional work," built and implemented the One Amo Platform, a "proprietary mortgage-technology platform" that is "capable of onboarding multiple independent brokers and teams, separating their data, permissions, and workflows, and supporting commercialization as a software-as-a-service . . . product independent of Wonder Rates." *Id.* ¶¶ 67–69.

On March 3, 2021, Mr. Tran and Mr. Pham signed identical "Founder Invention and Non-Disclosure Agreements" to govern One Amo's confidential and proprietary information and restrict copying, disclosure, and use thereof, as well as the development of such confidential and proprietary information. Compl. ¶ 72; *see also* Compl. Exs. A, B (together, the "Founder Agreement"). The Founder Agreement defines "Proprietary Information" to include "secret or confidential" business and technical information and restricts any disclosure, copying, use, removal, or deployment of proprietary information to authorized purposes in One Amo's line of business. Founder Agreement § 2(a). The Founder Agreement further provides that Mr. Tran and Mr. Pham make "full and prompt disclosure . . . of all discoveries, ideas, inventions, improvements, enhancements, processes, methods, techniques, developments, software, and works of authorship . . . which relate directly or indirectly to the business of One Amo," *id.* § 3(b), exempting any disclosed "Prior Developments," *id.* § 3(a). Mr. Pham disclosed "[a]ll Wonderate platforms" pursuant to the Founder Agreement, *see* Compl. Ex. B at 8, while Mr. Tran made no such disclosure, *see* Compl. Ex. A at 8.

After the One Amo Platform became functional, Wonder Rates became a customer of One Amo and began using One Amo as its loan-processing system. *See* Compl. ¶¶ 91, 123–30. Around this time, the business relationship between Mr. Tran and Mr. Pham deteriorated, in part due to Mr. Pham's perception that Mr. Tran was failing to meet his capital obligations to fund Amo's operations. *See id.* ¶¶ 106–09. Mr. Tran alleges that these statements were false and in fact part of a scheme to expel him from One Amo so that Mr. Pham could "use[] and deploy[] systems derived from BiFrost and the One Amo platform for Wonder Rates' operations,"

"including through cloning repositories, duplicating deployment environments, and copying . . . associated databases and operational histories." *Id.* ¶¶ 82–85. Mr. Tran further alleges that Mr. Pham "placed his personal interests and Wonder Rates' interests in conflict with One Amo's interests" by "suppressing One Amo's independent commercialization while simultaneously using the [One Amo] platform to expand Wonder Rates' internal operations." *Id.* ¶ 95.

### B. Procedural Posture

On December 1, 2025, Mr. Tran initiated this action by filing a complaint against Mr. Pham and Wonder Rates, asserting violation of the Defendant Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"), and related state-law claims. *See* ECF No. 1. The complaint named One Amo as a "Nominal Plaintiff" for the purpose of derivative claims brought by Mr. Tran as a shareholder plaintiff on One Amo's behalf. *Id.* ¶ 4. In the complaint, Mr. Tran alleged that Mr. Pham "secretly clon[ed] the technology stack, customer database, and business of" One Amo and "divert[ed] everything to" Wonder Rates. *Id.* ¶ 1. One week after filing the complaint, Mr. Tran filed a TRO application and an order to show cause why a preliminary injunction should not issue. ECF No. 13. In his TRO application, Mr. Tran requested that the Court issue an order enjoining the "ongoing cloning, copying, and deployment of derivative systems that directly incorporate Amo's proprietary code and Mr. Tran's BiFrost foundation." *Id.* at 11.

The Court heard argument on the TRO application on December 12, 2025. ECF No. 24. On December 17, 2025, the Court granted the application, ordering that Mr. Pham and Wonder Rates cease all copying, cloning, modification, and transfer of the BiFrost and One Amo Platform and return and restore the original code repository to Mr. Tran. Order at 7–8. The Court determined that Mr. Tran had "at least demonstrated that there are 'serious questions' going to the merits" of his DTSA claim by providing evidence that the source code underlying the One Amo Platform constituted a cognizable trade secret, copying of which would constitute misappropriation under the DTSA. *Id.* at 4. The Court further found that the balance of equities tilted sharply in Mr. Tran's favor because completion of cloning would practically nullify One Amo's commercial viability, that irreparable harm could be presumed by misappropriation of trade secrets, and that the public interest would be served by enabling the protection of trade

secrets. *Id.* at 4–5.

On January 5, 2026, the Court approved the Parties' stipulation extending Mr. Tran's time to file a first amended complaint, *see* ECF No. 31, which Mr. Tran filed on January 9, 2026, *see* ECF No. 33. Defendants subsequently moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(7), arguing that One Amo must be named as a nominal defendant (not a nominal plaintiff) and be given the opportunity to retain independent counsel under Delaware law. ECF No. 38. The Court subsequently set the hearing on the motion for preliminary injunction and motion to dismiss for April 10, 2026. *See* ECF Nos. 63, 66.

On April 10, 2026, the Court denied Defendants' motion to dismiss and instead ordered that the caption in this matter be modified to remove One Amo as a nominal plaintiff and to add One Amo as a nominal defendant so that One Amo could have the option to retain counsel upon service of the first amended complaint. ECF No. 70. The Court also extended the term of the TRO through May 8, 2026, while the preliminary injunction motion was under submission. *See id.* at 3.

## II.    LEGAL STANDARD

The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (alteration in original) (internal quotation marks omitted) (quoting *Shell Offshore,*

5

*Inc. v. Greenpeace, Inc.,* 709 F.3d 1281, 1291 (9th Cir. 2013)).  This allows a court "to preserve the status quo where difficult legal questions require more deliberate investigation." *Sencion v. Saxon Mortg. Servs., LLC*, No. 10-cv-03108-JF, 2011 WL 1364007, at *2 (N.D. Cal. April 11, 2011).

## III.    DISCUSSION

Based on its review of the moving papers, evidence in the record, and arguments at the hearing, the Court concludes that Mr. Tran has demonstrated that a preliminary injunction is appropriate in this case and that no security is warranted.

### A.  Analysis

#### 1.  Likelihood of Success on the Merits

To obtain a preliminary injunction, Mr. Tran must show a likelihood of success on the merits of his DTSA claim or, alternatively, serious questions going to the merits of his claim.  *See Winter*, 555 U.S. at 20; *Friends of the Wild Swan*, 767 F.3d at 942.  The elements of a trade secret claim are that (1) the plaintiff owned a trade secret; (2) the defendant acquired, disclosed, or used the protected secret through improper means; and (3) the defendant caused damage to the plaintiff. *Juries.AI, Inc. v. Sheu*, No. 25-cv-10188-BLF, 2025 WL 3290235, at *4 (N.D. Cal. Nov. 25, 2025).  A "trade secret" includes information where "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3); *see also WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845–46 (N.D. Cal. 2019).

The Court previously found that Mr. Tran had at least demonstrated that there were "serious questions" going to the merits of his DTSA claim, explaining as follows in granting his TRO applicaiton:

> Mr. Tran has provided evidence that the [One Amo Platform] constitutes a cognizable trade secret.  The [One Amo Platform] includes source code and modules that perform discrete functions to be offered as services by [One] Amo, and such information is within the ambit of the DTSA's definition of trade secrets.  The Tran Declaration further establishes that the [One Amo Platform] derives

> economic value from not being generally known or readily available through proper means because [One] Amo has expended time, energy, and resources into its technology with the expectation of offering a proprietary technological service to its mortgage broker customers. It further establishes that BiFrost is password-protected, has not been publicly released, and is not open source. As to misappropriation, Mr. Pham apparently admitted to copying the source code, and Mr. Tran has also submitted a cloning analysis showing substantial similarities between the two systems. Such copying would constitute misappropriation.

Order at 4 (citations omitted).

The Parties do not meaningfully dispute that Mr. Pham has copied substantial portions of the One Amo Platform source code and migrated the production database into a Wonder Rates–controlled environment. Rather, the primary disagreement on the merits of Mr. Tran's DTSA claim concerns ownership of the One Amo Platform. Mr. Tran argues that the One Amo Platform belongs to One Amo (of which he is a minority shareholder), pointing to the engagement of counsel to form One Amo, the execution of the Founder Agreement containing present-tense assignment language in favor of One Amo, and the declarations of engineers who "uniformly testify that they were building a product for One Amo—not Wonder Rates." Mot. at 3. Mr. Pham responds that Mr. Tran has failed to prove that One Amo owns the One Amo Platform and that, on the contrary, there is substantial evidence in the record that Wonder Rates owns the One Amo Platform. *See* Opp. at 10 ("The One Amo Platform was a project being developed and managed under Wonder Rates' funding and operational authority; One Amo, Inc. was the only intended corporate vehicle for future commercialization.").

As a preliminary matter, the Court agrees with Mr. Pham that the various engineers' declarations that Mr. Tran has submitted with his preliminary injunction motion, *see* ECF Nos. 47-3, 46-4, 47-5, 47-6, 47-7, are of no evidentiary value. According to Mr. Tran, these declarations of contractors working from Vietnam ostensibly show that the declarants understood their work to be conducted on behalf of One Amo. *See* Mot. at 7. As Mr. Pham points out, it is unclear whether the declarants understood the distinction between One Amo (the corporate entity) and the One Amo Platform (whose ownership is disputed), and this is at exacerbated by at least one declarant's later declaration that "[b]ecause English is [his] second language . . . [he] did not full[y] understand all the legal implications of the language used in that prepare[d] declaration[] and felt

United States District Court
Northern District of California

pressured to sign it." Opp. at 13 (quoting ECF No. 49-17 ¶ 7). These declarations, submitted with virtually no context and of questionable reliability, are virtually useless to the Court in determining whether Mr. Tran and Mr. Pham intended for ownership of the One Amo Platform to be with One Amo or Wonder Rates, and the Court declines to consider them.

With that said, the Parties' contemporaneous written agreements and objective manifestations of intent strongly suggest that they intended for the newly formed entity One Amo, not Wonder Rates, to own the One Amo Platform. These include the engagement of WilmerHale to draft One Amo's certificate of incorporation and bylaws, the formation of a distinct One Amo GitHub platform, the negotiation of founder equity with respect to One Amo, and, in particular, the mutual obligations set forth in the Founder Agreement, including present-tense assignment language transferring relevant intellectual property to One Amo and reservations of other rights in Wonder Rates. *See* Tran Decl. ¶¶ 14–17, 25–28; Founder Agreement § 3(a). The formation, equity issuance, assignment agreements, and maintenance of One Amo as a separate corporate entity strongly suggests that the One Amo Platform was understood to be a present corporate asset of One Amo. Indeed, it is difficult to conceive what the purpose of One Amo would be if not to function as the corporate vehicle for the development of the One Amo Platform, and there is no evidence supporting Mr. Pham's contrary argument that this ownership was intended to be cabined to "future commercialization." Opp. at 10.

While it is of course not Mr. Pham's burden to prove that ownership of the One Amo Platform lies elsewhere, it is worth noting at this stage that his alternate theory that Wonder Rates owned the One Amo Platform is unpersuasive. Mr. Pham dedicates substantial effort to arguing that "Wonder Rates . . . funded, managed, and directed development of the One Amo [P]latform from its inception." Opp. at 10. While Mr. Pham has certainly identified evidence in the record suggesting that Wonder Rates funded the development and creation of the One Amo Platform, funding the platform is not the same as owning it. At most, this reflects that Mr. Pham was responsible for contributing capital, whereas Mr. Tran contributed his technical knowledge and the preexisting BiFrost platform. Whether Mr. Tran retained an ownership interest in BiFrost—which he did not list as a prior development in the Founder Agreement—is not currently before the

United States District Court
Northern District of California

Court.

The Court is similarly unpersuaded by Mr. Pham's argument that Mr. Tran worked as an employee of Wonder Rates; he fails to identify any consistent payments to Mr. Tran from a Wonder Rates corporate account or other indicia that would suggest an employment relationship. Finally, Mr. Pham's current position that Wonder Rates owned the One Amo Platform from its inception is directly at odds with his position at the TRO stage that the Parties co-developed the software. *See* ECF No. 22 at 8 ("Wonder Rates has been virtually a co-developer and co-author of the AMO platform. The close, beneficial relationship between the two companies was always transparent to plaintiff Tran.").

Having found that, at least at this stage, the evidence supports Mr. Tran's position that the One Amo Platform was owned by One Amo and not Wonder Rates, the Court has no trouble in concluding that Mr. Tran has met his burden of demonstrating a likelihood of success on the merits. Mr. Pham's remaining scatter-shot arguments are unavailing. As to Mr. Pham's contention that Mr. Tran fails to identify the trade secrets with sufficient particularity, *see* Opp. at 15, the Court disagrees. On the contrary, the complaint clearly identifies as the claimed trade secret "a proprietary mortgage-technology platform with confidential components that included, among other things: broker and borrower workflows; multi-tenant tenant-isolation logic specific to mortgage operations; role-based permissioning tailored to broker teams; pipeline and loan-status orchestration; pricing and rate-quote workflows; lender configuration and pricing rules; operational dashboards; audit trails; and proprietary integrations with communications channels and internal operational systems." Compl. ¶ 67. As the Court previously explained, this type of information falls within DTSA's definition of protectable trade secrets. *See* Order at 4 (citing 18 U.S.C. § 1893(3)).

### 2. Remaining *Winter* Factors

Both Parties agree that "the first most significant *Winter* factor is proving the 'likelihood of success on the merits.'" Opp. at 8. The Court previously found that the balance of equities tilts sharply in Mr. Tran's favor, that Mr. Tran was entitled to the presumption of irreparable harm based on the misappropriation of proprietary information, and that the public interest would be

served by enabling the protection of trade secrets.  Order at 5–6.  The Parties largely renew their arguments from the TRO stage on each of these factors, and the Court finds that the circumstances in this case do not suggest any reason to depart from its prior determination as to balance of equities, irreparable harm, and public interest.  The Court accordingly finds that each of the *Winter* factors supports injunctive relief and GRANTS the motion.

### B.  Security

Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Ninth Circuit has "recognized that Rule 65(c) invests the district court 'with discretion as to the amount of security required, if any.'" *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).  "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

In opposing Mr. Tran's motion for a preliminary injunction, Mr. Pham requests that, in the event that injunctive relief is awarded, the Court require Mr. Tran to post a $5 million bond.  This the Court declines to do.  As was the case with the TRO, the Court will enforce the Parties' Founder Agreements, which expressly provide that "in the event of any . . . breach or threatened breach . . . [Amo] shall have the right to obtain an injunction . . . without posting a bond." Founder Agreement § 7(a); *see also* Order at 6.

### C.  Scope of Relief

In light of its determination at the hearing that it was inclined to grant the motion, the Court directed Mr. Tran to "meet and confer with Defendant regarding the provisions of the proposed preliminary injunction and to file a revised proposed preliminary injunction order that addresses Defendant's concern regarding its ability to protect its customers' personal information no later than May 1, 2026."  ECF No. 70 at 3–4.  Mr. Tran filed a proposed order on May 1, 2026. ECF No. 81.  Mr. Tran seems to have misunderstood the Court's instruction, which was limited to

10

Defendants' concerns regarding the protection of customers' personal information, *see* Opp. at 21 ("Defendant's objective in regaining control of the One Amo Platform is to secure and, if necessary, delete sensitive third-party borrower financial information to prevent any potential privacy breach."), as the proposed order includes plenty of enforcement mechanisms that were wholly outside of the scope of the Court's direction, which the Court declines to adopt.

Defendants have failed to submit any alternate language on the issue identified at the hearing.  The Court will accordingly adopt the language suggested by Mr. Pham in his opposition brief, *see* Opp. at 23:15–16.

## IV.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Defendants and all persons acting in concert with them are ENJOINED from:

    a.  Copying, cloning, modifying, transferring, accessing, or otherwise using any technology, systems, or data at issue in this action, including any derivative systems;

    b.  Deploying, operating, testing, or maintaining any system derived from such technology;

    c.  Using such technology, systems, or data for the benefit of Wonder Rates or any competing system;

    d.  Asserting any ownership, license, or other right as a basis to continue use of such technology;

    e.  Circumventing this Order directly or indirectly through any third party.

(2) Defendants SHALL immediately disable and suspend all public-facing systems derived from or related to the technology at issue.  No such systems may be reactivated absent further order of the Court.  Such systems SHALL be placed into a forensically sound, non-operational preservation state, including server and database snapshots, read-only backups, and preservation of all logs and system artifacts.

(3) Defendants SHALL preserve all repositories, databases, logs, backups, cloud environments, and systems containing any technology, systems, or data at issue in their

current state; and refrain from deleting, altering, overwriting, migrating, anonymizing, encrypting, or otherwise modifying any such materials.

(4) Defendants SHALL take all reasonable steps to restore any deleted or altered materials and preserve all evidence necessary to reconstruct deleted data, including logs, metadata, and system records.

(5) Mr. Pham is temporarily suspended from exercising authority as a director or officer of One Amo, Inc., solely to the extent necessary to prevent dissolution, shutdown, asset transfer, sale, access, or disclosure of proprietary information during the pendency of this action.

(6) Defendants SHALL preserve all evidence, including but not limited to source code, repositories, logs, backups, databases, communications, emails, messages, cloud instances, devices, and credentials relating to BiFrost, One Amo, or any derivative systems.

(7) Defendants SHALL preserve all borrower, broker, and consumer data associated with the systems at issue in their current state.  Defendants are ENJOINED from directly or indirectly accessing, using, processing, or interacting with such data, as well as deleting, altering, overwriting, anonymizing, encrypting, or modifying such data.  All such data SHALL be maintained in a secure, segregated, access-restricted environment.  Defendants SHALL preserve all logs and audit trails identifying all prior access, all transfers or migrations, and all persons or systems that accessed such data, including any access from outside the United States.  No access shall occur absent further order of the Court, including for purposes of maintenance, review, or analysis.  Any request to access or modify such data must be presented to the Court in advance.

(8) Mr. Tran SHALL immediately delete all of Wonder Rates' third-party consumer data and personally identifiable information held on the One Amo Platform or any other platform accessible by Mr. Tran.

(9) Within seven days of this order, Defendants SHALL submit sworn declarations confirming compliance with this Order and identifying all relevant materials.  Within seven days of this order, Mr. Tran SHALL submit sworn declarations confirming compliance with this

United States District Court
Northern District of California

12

Order and identifying all relevant materials.

(10)     This order shall remain in effect during the pendency of this action unless modified or terminated by further court order.

**IT IS SO ORDERED.**

Dated:  May 1, 2026

_____
BETH LABSON FREEMAN
United States District Judge